## ALEXANDER *v.* SUPERINTENDENT, SPRING GROVE STATE HOSPITAL

[No. 220, September Term, 1966.]

*Decided April 11, 1967.*

The cause was argued before HAMMOND, C. J., and HORNEY, OPPENHEIMER, BARNES and McWILLIAMS, JJ.

*Louis Peregoff* and *John W. Hessian, III* for appellant.

*Edward R. Jeunette, Special Assistant Attorney General,* with whom was *Francis B. Burch, Attorney General,* on the brief for appellee.

HORNEY, J., delivered the opinion of the Court.

This is an appeal from the order of the Circuit Court for Baltimore County (Proctor, J.) recommitting Archer A. Alexander to Spring Grove State Hospital following a second sanity hearing before the court without a jury at which the court found that the patient continued to be a danger to society.

The patient was admitted to the hospital under a court order on July 2, 1959 as the result of "wrecklessly driving an automobile while intoxicated." A diagnosis made at the time indicated that the patient had a chronic brain syndrome associated with a moderate brain trauma. There was also evidence of poor judgment in that the patient was unable to think clearly. His condition improved and he was discharged on August 14, 1959, but was readmitted on October 21, 1959 after another arrest for drunkenness.

At a meeting of the forensic staff of the hospital (of all the hospital physicians under the chairmanship of the superintendent) on November 10, 1959, the initial diagnosis was confirmed and it was recommended—on account of his mental condition and the conclusion that he would not be able to return to his home and work due to domestic pressures—that the hospitalization of the patient be continued. The record does not indicate whether the patient was ever the subject of other forensic staff meetings, but it does show that he was declared incompetent to handle his own affairs on February 16, 1961.

Following the first sanity hearing on December 14, 1961, the patient was sent back to the hospital for further treatment. Subsequently, despite many physical disabilities, the most serious of which was the condition of his heart, he was given some privileges on the hospital grounds. In July of 1963 and thereafter he was permitted to leave the hospital periodically to go to church and to visit his family, but the latter privilege was suspended when he failed to return to the hospital on Christmas Eve in 1964. Later, the privilege was restored and he visited his family at Christmas in 1965.

Dr. Imre Kopits, a psychiatrist and chief of the geriatrics board at the hospital was the only medical witness for the superintendent of the hospital at the second sanity hearing on March 8, 1966. Besides giving the hereinbefore related case history of the patient based on the hospital records, the doctor testified that he had observed the patient every day since October 19, 1965 and had worked with him in group therapy twice a week. He thought that after several more months of treatment it would be possible to release the patient to a nursing home so that he could thereafter visit the hospital at intervals as an outpatient. When asked whether the patient would be a danger to himself or to society, the doctor replied that there was a strong possibility he might be a danger to himself if he resumed drinking because this could worsen his heart condition. He also stated he could possibly be a menace to others, particularly his family.

The patient, insisting that he was well enough to leave the hospital, testified that he thought he could get back his old job or find new employment. He denied drinking to excess and acting violently toward his family and did not remember the numerous automobile accidents he had been involved in. But he proffered no testimony as to his mental competency.

His wife and daughter testified as to the conduct of the patient, such as striking his wife and shooting at her, while visiting his home. And, because they were afraid of the consequences, they did not want him to reside with them.

The lower court, as reasons for recommitting the patient to the hospital, took into consideration the fact that the doctor—who had based his opinion partly on the case history but prin-

cipally on the daily observation of the patient over a period of five months—was of the opinion that if released there would be a strong possibility of danger to himself and others as well as the further fact that the patient had not met the burden that he had of showing that he was mentally competent. While the court was of the opinion that the patient had improved considerably, it was convinced that he still needed continual medical and psychiatric treatment either in the hospital or in an adequately staffed nursing home.

The questions on appeal are: (i) whether the evidence or inferences therefrom were legally sufficient to support the finding that the patient was a danger to society or himself; and (ii) whether the continued detention of the patient was a violation of due process and equal protection of the law.

(i)

We think the finding of the lower court that the patient was still a danger to society was correct. In essence, the test for the release of a person committed to a mental institution is whether the patient if released would be a danger to the welfare of himself or society as a whole. In *Salinger v. Superintendent*, 206 Md. 623, 112 A. 2d 907 (1955) as well as in *Keiner v. Superintendent*, 240 Md. 608, 214 A. 2d 788 (1965) it was said that the test is whether the patient, as a free man, would by reason of a mental disease or condition be a danger to himself, his safety or the person or property of others. See also 29 Am. Jur. *Insane Persons* § 46 and the casenote in 21 Md. L. Rev. 279 with regard to the *Salinger* case.

The contention of the appellant that the testimony of the doctor was not sufficient to recommit him to the hospital is not reasonable under the facts and circumstances of this case. The supposition that his testimony was based exclusively on the hospital records and findings of the forensic staff made more than six years before overlooks the fact that the doctor besides partial reliance on the case history of the patient as a basis for his conclusion—which was permissible, *Wolfinger v. Frey*, 223 Md. 184, 162 A. 2d 745 (1960), in aid of the formation of an opinion—had also treated and observed the patient over a period of five months. It was held in *Perkerson v. Director*, 239

Md. 142, 210 A. 2d 371 (1965), a defective delinquent proceeding under Article 31B, that the evidence of the only witness (the Director of Patuxent) based entirely on his opinion and the examinations and reports of other professional personnel was sufficient to support a finding of defective delinquency if, as he had, the trier of fact accepted it. Assuming, as we do for the purposes of this case, that the provisions of § 21 of Article 59, relating to sanity hearings, do not give rise to quite so liberal an interpretation, it is nevertheless clear that the evidence of the sole witness for the appellee based on both the case history and the observations of the treating doctor was sufficient in this case to warrant the recommittal of the appellant to the hospital.

The further contention of the appellant that his continued retention as a patient, despite his improved condition, was based on the belief that he could not find employment or get along with his family because of his poor judgment, likewise overlooks the fact that the prognosis is that the patient may be ready for release in a few months. This is an administrative matter, which, in the absence of evidence of its abuse does not concern the courts. We recognized in *Keiner, supra,* that even though there might be a remission of symptoms, if there is testimony as to the likelihood of their recurrence upon release, then the order of the lower court to recommit the patient to the hospital will not be disturbed.

(ii)

We also hold that the contention of the appellant that his continued detention constitutes a violation of due process and equal protection of the law lacks substance. The claim is based on the theory that he is not receiving proper treatment at the hospital because the doctor admitted that some seven hundred and fifty patients were being treated in the geriatrics therapy group supervised by him. There was, however, no evidence that the doctor was the sole psychiatrist or that he treated that many patients: rather the record indicates that as chief of geriatrics he had the responsibility of seeing that all patients received treatment. And there was no evidence that the appellant was not receiving the same treatment afforded other patients, or that

he was mistreated or not given the best psychiatric help available. On the contrary, the evidence shows that he was receiving therapy twice a week and that he was making progress. When confronted with a similar allegation in *Director v. Daniels,* 243 Md 16, 221 A. 2d 397 (1966), we said (at p. 50):

> "Having concluded as a fact that Daniels has received or had had available to him * * * all of the treatment techniques available to other inmates at Patuxent, and also as generally recognized and utilized in the field of psychiatry, it is obvious that he is not being denied equal protection of the law."

Also see *Perkerson v. Director, supra,* where it was held that the method there used of producing testimony—the opinion of the only state witness, based on the examinations and reports of others, that the patient was a defective delinquent—had not constitutionally deprived him of the right of confrontation and cross-examination because he had a right to summon any person whose report or examination had been relied on.

We may add that we think that counsel for the appellant should be allowed a reasonable fee at the expense of Baltimore County.

*Order affirmed; Baltimore County to pay the costs.*